# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin E. Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9369 | **DATE** | 8/17/2004 |
| **CASE TITLE** | Cherrie L. Gage vs. Metropolitan Water Reclamation District of Greater Chicago | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER. Defendant's motion for summary judgment is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | number of notices | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | AUG 1 8 2004 | | |
| | Notified counsel by telephone. | | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | | 37 |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| JD | courtroom deputy's initials | | | date mailed notice | | |
| | | | | mailing deputy initials | | |

Date/time received in central Clerk's Office

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHERRIE L. GAGE,                    )
                                    )
        Plaintiff,       )
                                    )
    v.                        )    Case No. 02 C 9369
                                    )
METROPOLITAN WATER RECLAMATION      )
DISTRICT OF GREATER CHICAGO,        )
                                    )
        Defendant.       )
                                    )

DOCKETED

AUG 1 8 2004

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

     Plaintiff Cherrie Gage ("Gage") filed a four-count amended complaint against Defendant

Metropolitan Water Reclamation District of Greater Chicago ("District") alleging it violated Title

VII, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1983. Defendant has moved for

summary judgment. For the reasons stated below, we deny in part and grant in part Defendant's

motion for summary judgment.

## I.    BACKGROUND[1]

     Cherrie Gage has worked for the Metropolitan Water Reclamation District for fifteen years. The

District, a unit of local government, provides sewage treatment and related services for the greater part

of Cook County, Illinois. The District is made up of the following departments: Maintenance and

Operations ("M&O"), Research and Development ("R&D"), Finance, Information Technology, General

Administration, Engineering, Purchasing, Treasury, and Law. Nearly all of the District's positions are

---

[1] The following facts are culled from the properly pled portions of the parties' Local Rule
56.1 Statements of Material Facts and accompanying exhibits. Where either party's LR 56.1
statement is undisputed by the opponent, our opinion will only include a citation to the original
statement.

37

categorized as civil service and are subject to a competitive examination. Once one successfully completes an examination for a position, a list of potential candidates for the position is posted. The list pools applicants into groups based on exam performance. The General Superintendent of the District then can appoint candidates for a position from the group containing employees who scored the highest on the examination. When an individual is appointed to a civil service position, "[a]ppointments shall be on probation for a period fixed by the rules. . ." (Defendant's Local Rule 56.1 Statement ("Def. LR 56.1") ¶ 6). Probation constitutes a working test period during which an employee can be evaluated to determine if she can perform the duties of the position satisfactorily. If, at any time during the probationary period, it is determined that the employee "cannot or will not adequately or satisfactorily perform the duties of the position if given permanent employment," the District's General Superintendent, with the approval of the Director of Personnel, may discharge the probationary employee. (Def. LR 56.1 ¶ 8). No appeal of the decision is permitted. Once an employee satisfactorily completes probation, however, she is considered to have attained civil service status and shall not be discharged except for cause. She also may have an opportunity to be heard before the District's Civil Service Board.

Cherrie Gage graduated from the University of Chicago in 1987 with an economics degree. She subsequently earned an MBA and Masters in Public Management from Keller Graduate School. (Plaintiff's Local Rule 56.1 Statement ("Pl. LR 56.1") ¶ 1). She was hired by the District in 1989 as an administrative assistant/secretary to the Commissioner. In 1991, she was appointed to a Management Analyst I ("MAI") position in the M&O Department. (Def. LR 56.1 ¶ 11). At the District, there is a career track from the position of MAI to Management Analyst IV. In 1995, Gage was transferred from the M&O Department to an MAI position in the R&D Department. (Def. LR 56.1 ¶ 12). Gage received positive reviews for her work while in the MAI position. (Pl. LR 56.1 ¶ 9). Gage was appointed to an

MAII position in R&D in 1999 and completed her probationary period on January 1, 2000. She received a rating of "Exceeds Standards" for her work in 1998 and 1999. (Pl. LR 56.1 ¶ 11). Gage passed the required examination and was appointed to an MAIII position in M&O on November 17, 2000. The probationary period for the MAIII position is one year. (Def. LR 56.1 ¶ 15).

As an MAIII, Gage was assigned to the position of Manager of the Contract Payments Unit ("CPU") of M&O. Her direct supervisor was Michael Bland. Bland, an MAIV, has worked for the District since 1977. As Gage's supervisor, Bland was responsible for evaluating Gage's work as an MAIII and completing reports on her service throughout her year-long probationary period. Bland, who is white, supervised three units in M&O: CPU, Budget Management, and Staffing. The other two units were headed by white females. Gage is African-American. Gage took over the CPU position from Karen Sizemore, a white female, who had been performing the job as the CPU Manager in an "acting capacity." Sizemore was an MAII. Bland had recommended Sizemore for permanent appointment to the MAIII CPU Manager position, but upper management did not follow his recommendation. Bland acknowledged he was displeased that Sizemore did not receive the MAIII CPU Manager position. (Pl. LR 56.1 ¶ 22). According to Delores Stewart, an employee in the CPU division, Bland told Stewart, "It's not what I want. I have to deal with it. I know what I have to do about it." (Pl. LR 56.1 ¶ 85). Bland denies making this statement.

As Manager of CPU, Gage was responsible for, *inter alia*, reviewing and processing payments, change orders, and rate adjustments; conducting administrative investigations; and resolving problems that arose regarding payments on contracts. (Def. LR 56.1 ¶ 17). On Gage's first day, Bland told her, "You are a beautiful woman. No. You are a beautiful black woman, but that's not what you are being evaluated on." (Pl. LR 56.1 ¶ 57). The following day, Gage notified Bland that she was disturbed by his comment and felt that she had accomplished what she had based on hard work, not her race.

3

According to Gage, Bland responded that he had grown up on a farm and claimed that he did not mean the statement offensively. Bland testified that he apologized to Gage for making the statement. He testified it was "a frustration statement" even though he acknowledged that Gage had not mentioned her race or done anything to suggest Gage thought she would be evaluated based on her race. (Pl. LR 56.1 ¶¶ 71-72).

Following this conversation, and on his second day of supervising Gage, Bland began maintaining a log of notes documenting Gage's whereabouts, work hours, and other activities. (Pl. LR 56.1 ¶¶ 153-154). He documented what had occurred between Gage and him on her first day, but omitted his comment about Gage being a beautiful black woman. (Pl. LR 56.1 ¶ 163). When asked about the log at his deposition, Bland testified that he kept the log because something "appeared to be turned around from a compliment to all of a sudden becoming disturbing the next day." He explained, "being a supervisor of many years I had the little, oh-oh, something is not right here." (Pl. LR 56.1 ¶ 154). Bland testified that he would make entries in the log because it was something he wanted to remember for a reason. (Pl. LR 56.1 ¶ 156). Bland did not keep log notes on the other managers he supervised, Elizabeth Collins (MAIII) or Linda Dunlap (Senior Personnel Analyst), both white females, or Karin Sizemore, the white female MAII who held Gage's position in an acting capacity before Gage was appointed. (Pl. LR 56.1 ¶ 272).

According to Gage, Bland informed her she needed to report to him whenever she left her desk for any reason. Bland denies he did so. According to Delores Stewart, a principal clerk stenographer who worked for Bland from 1997 to 2002, Bland asked her to monitor Gage's activities and notify him any time Gage left her work station, including going to the bathroom. Stewart testified that Bland did not ask her to watch non-minorities in that way. Bland denies asking Stewart to monitor Gage. According to Stewart, when Stewart asked Bland why Gage was being singled out, Bland told her to also

watch Jackie Lee, another African-American, who was Gage's administrative assistant. (Pl. LR 56.1 ¶ 138). Jackie Lee and Patricia Harmon observed Bland monitoring Gage on a daily basis. (Pl. LR 56.1 ¶ 141). Bland denies doing so. Bland does acknowledge that he did not monitor non-minority employees in this manner or ask Stewart to monitor non-minority employees. (Pl. LR 56.1 ¶¶ 136-7). Gage also reported that Bland berated and yelled at her. (Pl. LR 56.1 ¶ 228). Bland admits that he and Gage had heated discussions. *See, e.g., id.* ¶ 86.

Gage contends she was treated differently than non-minority employees who worked for Bland in other ways as well. For instance, Gage contends she was not permitted to attend training necessary to assist her in performing her job as an MAIII. The District denies this accusation. Gage also alleges that she was denied the support staff she needed to accomplish her tasks as CPU Manager. She explains that Sizemore, who typically would have reported directly to Gage, was transferred by Bland to a different unit. According to Stewart, she assisted the CPU Manager with contract payments before and after Gage's tenure, but Bland instructed Stewart not to assist Gage or Lee in any manner.[2]

During the first three months of Gage's probationary period as an MAIII, November 2000 through February 2001, Bland evaluated Gage's performance. The pre-printed evaluation form, which Bland used to assess Gage's performance, contains the following categories on which employees are rated: Punctuality and Attendance, Employee Contacts, Quality of Work, Volume of Acceptable Work, Supervisory Control, and Overall Evaluation. (Pl. LR 56.1 ¶ 316). The employee may be rated on a scale that includes (from best to worst): Outstanding, Exceeds Standards, Meets Standards, Requires Improvement, and Not Satisfactory. (Pl. LR 56.1 ¶ 317). Gage received an overall rating of "Requires Improvement." In the specific categories, Bland determined that Gage required improvement in her

---

[2] Bland admits Stewart helped others with contract payments, but denies he instructed her not to assist Gage.

quality of work, volume of acceptable work, and employee contacts. He concluded that she met standards for attendance and supervisory control. Gage, who disagreed with the substance of her evaluation, composed a written response. She sent her response to the District's Director of Personnel as well as to the Chief of M&O, the Assistant Chief Engineer, and Bland. She also wrote a letter on February 22, 2001 to Frances Wilkins, the District's Equal Employment Officer, raising her concerns about Bland's evaluation.

On May 1, 2001, Gage received an oral warning from Bland for failure to follow his instructions. She recalls receiving the warning for not being present at her desk when Bland was looking for her. Gage submitted an e-mail message she sent Bland on May 1, 2001 to notify him that she had been meeting with Mr. Neubauer from the Purchasing Department from 1:00 p.m. until 1:44 p.m. on May 1, 2001. (Pl. LR 56.1 ¶ 299). Bland admits that he gave Gage an oral warning, but he could not remember the specific basis for this warning. His log reports that her warning was for "being away from her work area for an extended time." (Pl. Ex. 16).

Gage received a similar evaluation from Bland on her six-month performance review, which covered the time period from February 18, 2001 through May 17, 2001. Again, she received an overall evaluation rating of "Requires Improvement" and the rating in each category was exactly the same. Gage refused to sign her evaluation. Following that review, Gage met with the Chief of M&O, Thomas O'Connor, to inform him she felt that Bland was unfairly rating her and told him about Bland's comment on her first day of work. She also wrote a response to Bland's six-month evaluation, sending a copy of her response to O'Connor and Bland's other supervisors.

According to O'Connor, sometime later in May, 2001, as a result of Gage's written responses to Bland's three and six-month evaluations and his meeting with Gage, O'Connor discussed Gage's

complaints with Matthew Menze, the Director of the District's Personnel Department. O'Connor asked Wilkins, the District's Equal Employment Officer, to inquire into the disputed performance reports.

Later, on her nine-month evaluation, dated July 6, 2001, Gage again received an overall rating of "Requires Improvement." Her ratings in each subcategory were the same as the prior two evaluations. Gage again composed a response to the evaluation on August 23, 2001, dated August 31, 2001. In that August 31 response, she stated that Bland's behavior since her first day had been nothing less than discriminatory and harassing. (Def. LR 56.1 ¶ 13). On August 31, Bland prepared a written warning for Gage because she had remained in the office building past 4:45 p.m. to compose her response on August 23. He then issued an oral warning on September 7, 2001 for her August 23 alleged transgression. (Pl. LR 56.1 ¶ 307). He stated she violated the "Cargill memorandum", a memorandum authored by Gregory Cargill, the Assistant Chief Engineer, which set the official work hours as 8:45 a.m. to 4:45 p.m. The memorandum explained that employees required permission to be in the building outside of official work hours. According to Gage, other white employees often stayed past the posted work hours without incident. Lee and Harmon also testified that Bland allowed white employees to work outside the posted hours.

Pursuant to O'Connor's request, Equal Employment Officer Wilkins conducted an inquiry into Bland's three-month and six-month performance evaluations of Gage. As part of her investigation, Wilkins interviewed Gage, Bland and Cargill, one of Bland's supervisors. On September 19, 2001, Wilkins issued her report outlining her inquiry into Gage's complaints. Wilkins sent her report to the Director of Personnel, Matthew Menze. Her report concluded that Gage's work volume rating for the first three months did not take into consideration the fact that Gage had actually worked only the last six weeks of the first three-month rating period. Accordingly, it was to be expected that Gage's overall work volume would be quite low, as compared to an employee who worked all twelve weeks. Wilkins

found that Bland's failure to take account of that disparity was improper. Wilkins determined, however, that the other ratings Gage received did not warrant a change.

Later, on September 25, 2001, Wilkins responded to Gage's August 31 evaluation response. As noted above, that written response also included an accusation of discrimination and harassment by Bland. By letter, Wilkins informed Gage that GS Directives 98-6 and 00-1 provide for counseling, investigation and informal resolution of complaints of harassment. *See* Pl. Ex. 60. Wilkins attached both directives and the Discrimination and Harassment Complaint Filing Forms to her letter and suggested that Gage use the forms should she wish to file a complaint.

On October 31, 2001, Bland completed his one-year report on Gage's performance during her probationary period. Bland rated her overall performance as "Not Satisfactory." (Def. LR 56.1 ¶¶ 60-61). Specifically, he stated that her work was not satisfactory with regard to her employee contacts and her low quality and volume of acceptable work. He explained that she made numerous errors; she required an inordinate amount of supervisory review; and she failed to timely complete investigations, develop contract change order training materials, and conduct training in the field. (Def. LR 56.1 ¶¶ 63-66). In terms of employee contacts, Bland stated that she failed to demonstrate the ability and willingness to follow her supervisor's (Bland's) instructions. Bland recommended Gage's probationary appointment be terminated.

Bland met with his supervisor, Gary Ziols, Assistant Chief Engineer, about his recommendation for Gage's termination and Ziols approved the recommendation. Ziols then met with his supervisor, O'Connor, who signed off on the recommendation. Subsequently, O'Connor met with the District's General Superintendent, John Farnan, who then terminated Gage's probationary appointment.

The parties dispute what occurred on Gage's last day of work under Bland. According to Bland, Gage said, "thanks for making this a day that you will never forget." (Pl. LR 56.1 ¶ 566). Bland wrote

to his superiors requesting that "proper action" be instituted against Gage for the incident. (Pl. LR 56.1 ¶ 562). Based on Bland's request, a suspension of Gage was issued for the highest level of infraction, "Intolerable Offense." (Pl. LR 56.1 ¶ 568). The infraction was later rescinded by the Department of Personnel based on a failure to comply with the notice requirements and because Gage's language and conduct did not rise to the level of "use of abusive or threatening language or conduct" which is required to justify a finding of such an infraction. (Pl. LR 56.1 ¶ 568). A memorandum from the Labor Negotiator who reviewed the suspension stated to the Department of Personnel that "I do not believe Bland and Ziols have demonstrated that there was a 'threat' made or threatening conduct by Gage which necessitated disciplinary action." (Pl. LR 56.1 ¶ 568).

Following the termination of her probation as an MAIII in CPU, Gage began work as an MAII in the R & D Department. She received the rating of "Highly Effective" in December 2002. (Pl. LR 56.1 ¶ 17). The evaluation praised Gage for exceeding expectations for the job, setting an example for others to follow, and "complet[ing] assignments promptly and within the established deadlines." (Pl. LR 56.1 ¶ 17). Gage continues to work for the District.

Gage filed this suit claiming race discrimination, retaliation, and hostile work environment in violation of Title VII. She also alleged municipal liability under 42 U.S.C. § 1983. In Count I, she alleges discrimination in the terms and conditions of her employment in the form of a racially hostile work environment in violation of Title VII. In Count II, she alleges discriminatory demotion, and Count III alleges retaliation. Finally, in Count IV, Gage alleges a widespread policy and practice of depriving African-American employees of their constitutional rights. The District has moved for summary judgment on all counts.

9

## II.    **STANDARD OF REVIEW**

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (quotation marks omitted). Once the moving party has met this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## III.    **ANALYSIS**

### A.    **Title VII**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against any employee for opposing an unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a). A plaintiff may establish a Title VII claim either by offering direct proof of discrimination or retaliation, or by presenting evidence indirectly under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). Under either method, summary judgment is

inappropriate if Gage proffers evidence from which an inference of intentional discrimination can be drawn. *Fuka v. Thompson Consumer Electronics*, 82 F.3d 1397, 1402-03 (7th Cir. 1996).

### Direct Method

Under the direct method, a plaintiff may show through either direct or circumstantial evidence that "the employer's decision to take the adverse job action was motivated by an impermissible purpose, such as her race ... ." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). Direct evidence of discrimination is evidence that would show a clear acknowledgment of discriminatory intent by the employer. *See, e.g., Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (explaining that direct evidence is an "outright admission by the decisionmaker that the challenged action was undertaken because of the [employee's] race"). Alternatively, Gage may succeed under the direct method by presenting circumstantial evidence which provides a "convincing mosaic of discrimination," *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), from which a jury may reasonably infer intentional discrimination. *Volovsek v. Wisconsin Dep't of Agric., Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003). In *Volovsek*, the Seventh Circuit explained that such circumstantial evidence typically includes: "(1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; or (3) evidence that the employee was qualified for the promotion and passed over and the employer's reason for the difference in treatment is a pretext for discrimination." *Id.* at 689-90 (citing *Troupe*, 20 F.3d at 736).[3]

---

[3] The Seventh Circuit has recognized that the third type of circumstantial evidence under the direct method is substantially the same as the evidence required under the indirect method of *McDonnell Douglas*. *See Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

**Indirect Method**

Under the indirect method, the plaintiff must first establish a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the plaintiff succeeds in doing so, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its action. *See id.* Finally, if the defendant meets this requirement, the burden shifts back to the plaintiff to present evidence that the reason provided by the defendant is pretextual. *See id.* at 804.

Gage points to the same evidence to support all of her claims under Title VII. Gage does not have direct evidence of a clear acknowledgment of discriminatory intent by the District for any of her claims under Title VII.[4] Rather, Gage proffers circumstantial evidence which she argues provides a basis to draw an inference of intentional discrimination and retaliation under the direct method. In her memorandum opposing summary judgment, Gage argues that a genuine issue of material fact exists whether we address her discrimination claim under the direct circumstantial approach or under the *McDonnell Douglas* burden shifting indirect approach.[5] We will address the viability of her claims under each method. We address each claim in turn.

**1.      Demotion/Termination of Probation**

Gage points to a wide range of circumstantial evidence which she argues could permit a jury to find intentional discrimination based on race. Indeed, circumstantial evidence, if sufficiently persuasive, may defeat a motion for summary judgment. *See Troupe,* 20 F.3d at 736. In short, Gage alleges that from her first day of work under Bland, Bland sought to ensure she would not complete her probationary

---

[4] Defendant assumes that Gage must use the indirect method because she does not have any direct evidence of race discrimination or retaliation. (Motion, at 4). While Gage does not have any direct evidence, she still may proceed under the direct method using circumstantial evidence. *See Troupe,* 20 F.3d at 737.

[5] In her memorandum, however, she proceeds only under the direct method.

period successfully. For the entire year she worked under Bland, Gage alleges he treated her differently than the white employees he supervised. Most damaging, she contends, is that Bland evaluated her performance differently than white employees, culminating in her termination from the CPU Manager position. Gage submits evidence she believes falls under each category of circumstantial evidence outlined in *Troupe*.[6]

The first type of evidence outlined in *Troupe* "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736. As to this type of evidence, Gage points to comments made by Bland to her and her African-American colleagues.[7] For example, on Gage's first day of work under Bland, Bland

---

[6] From the outset, we agree with the District that to the extent Gage seeks to present a separate claim accusing the District of failing to promote her at the same pace as those who are not African-American, it is not actionable. This conclusion is warranted because such a claim is not like or reasonably related to the conduct described in her EEOC charge. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002) (explaining that an EEOC charge and a federal complaint must describe the same conduct and implicate the same individuals). Indeed, Bland's treatment of Gage over the course of her probationary period is unrelated to her progression through the ranks over her fourteen-year career at the District. As such, she is barred from pursuing this claim under Title VII.

[7] Bland is Gage's immediate supervisor and was responsible for evaluating her work product and recommending her termination from probation. The District posits that because Farnan, the General Superintendent of the District, is the final decisionmaker, the District cannot be liable for Bland's actions. (Motion, p.12). However, Gage has pointed to the testimony of Bland's supervisors from Bland up the chain of command to Farnan which demonstrates that Bland's negative evaluation was what led to Gage's termination. Ziols, Cargill, O'Connor, and Farnan all testified that they had no first-hand knowledge of Gage's work product, undertook no investigation into it, and acknowledged that they relied on Bland's ratings of Gage's performance. For example, Farnan admitted that he did not undertake any independent investigation or assessment of Gage's performance, relied on Bland's rating and the department head's recommendation, and never heard about Gage's verbal and written complaints of race discrimination by Bland. On the record before us, we find that Bland was a decisionmaker and, accordingly, Bland's treatment and evaluation of Gage are relevant to assessing the District's liability. *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (acknowledging in age discrimination case that if supervisor taints with prejudice

13

acknowledges that he said to her, "You are a beautiful woman. No. You are a beautiful black woman, but that's not what you are being evaluated on." According to Gage and another African-American employee, Delores Stewart, Bland routinely made racially derogatory statements in the workplace. Bland used the term "Black Bitching Club" to refer to African-American employees because there were "a few people who complain and gripe about most things and until recently the participants [were] all black." Bland asked Stewart how "you all get your hair like that?" He also asked Stewart one morning, "What is it with you all people, you eat ribs 24 hours a day." When she asked "what do you mean 'you all' people? Do you mean me or black people?" Bland responded, "I don't see none of us eating ribs at 8:45 a.m." When Stewart wore overalls on a casual dress day, Bland asked her whether she "[was] going to pick the cotton today." In meetings, Bland brought up the issue of employees' qualities relating to race, color, gender or religion. Additionally, Bland expressed his belief to Stewart that people used their race as an excuse not to do their job.[8]

The District argues that this testimony simply constitutes stray remarks by Bland and is insufficiently tied to Gage's termination. The Seventh Circuit has explained that "bigotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). The fact that Bland, who was Gage's supervisor and the individual responsible for evaluating her performance, made all of these statements does suggest that Bland had bigoted views and that he might have allowed those views to sway his professional judgment. However, in order for isolated

---

final decisionmaker's decision then company can be found liable); *see also Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 623-24 (7th Cir. 2002).

[8] Gage also points to the fact that when told by his supervisor that he was a "poster boy" for discrimination claims, he responded that he was confused. However, that statement was made well after Gage left Bland's supervision, diminishing its probative value.

comments to be probative of discrimination, they also must be causally connected to the termination

decision-making process or contemporaneous with the termination. *See Marshall v. American Hosp.*

*Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998). None of these alleged statements indicate the District was

terminating Gage's probationary status because of her race. Indeed, many of the statements are not even

directed at Gage. Gage argues that for the entire year under his supervision, Bland treated her and other

minorities differently and inappropriately because of their race. His bias, which she argues is evidenced

through the bigoted statements he made to various CPU employees, tainted each of the performance

reviews Bland submitted for Gage. In short, Gage is asking us to infer discriminatory intent based on

his inappropriate statements, which, in turn, tainted Bland's evaluation of her performance. Some of

Bland's ambiguous statements may indicate bias and, indeed, the "task of disambiguating ambiguous

utterances is for trial, not for summary judgment." *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.

1990). However, Gage has not demonstrated "a real link" between the bigotry and her termination.

Nonetheless, as is the nature of cases based on circumstantial evidence, it is the *cumulative* effect of the

evidence that may be able to persuade a fact-finder to infer discrimination. Accordingly, we consider

Bland's statements in conjunction with the other evidence Gage presents.

In addition to Bland's statements, Gage also believes she has presented the second kind of

evidence outlined in *Troupe*: "evidence, whether or not rigorously statistical, that employees similarly

situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an

employer is forbidden to base a difference in treatment received systematically better treatment."

*Troupe*, 20 F.3d at 736. For example, Gage explains that Bland kept a log on Gage and Stewart, another

African-American employee under his supervision, but did not do so with the other managers he

supervised such as Dunlap and Collins. Additionally, Gage was required to report to Bland whenever

she left her work station and Bland directed other employees to monitor Gage when she left her work

area. He did not require the same of white employees. Gage also explains that on her first day, Bland reassigned an employee, who was to have reported to Gage, to a different unit. This, according to Gage, left her without adequate staff to manage the CPU. Gage claims she was given minimal training for her new position, in contrast with that provided to Sizemore, her predecessor, and Nick Hoffman, her replacement, a white male. Stewart testified that Bland gave her instructions not to assist Gage. In contrast, Bland reportedly told Stewart to provide Hoffman with any assistance he required. Lee, an administrative assistant in the CPU, assisted Sizemore and Hoffman with change orders and contracts, but she did not assist Gage with those tasks. Gage also testified that Bland permitted white MAIII's to have internet access whereas when Gage requested internet access to contact vendors, Bland denied her request. Gage reported that she was criticized and received poor evaluations for minor mistakes, whereas according to Stewart, Gage's replacement, Hoffman, needed extra assistance, but continued to receive a rating of "meets standards."[9]

In sum, Gage has presented evidence that white managers – her predecessor, replacement, and the other two unit managers under Bland's supervision – received different and better treatment than Gage in several aspects of the job. However, Gage was a probationary employee. Although Sizemore was not under probationary status when she was Manager of the CPU, she was working in an "acting status" because she was only an MAII. Additionally, Gage's replacement, Hoffman, an MAIII, was not on probationary status. The District argues that probationary employees should not be considered similarly situated, citing, *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1270 (6th Cir. 1986) and *Bogren v. Minnesota*, 236 F.3d 399, 405 (8th Cir. 2000). The Seventh Circuit recently endorsed such a view in the context of evaluating whether employees are similarly situated under the *McDonnell*

---

[9] Gage also contends that Hoffman had "real performance problems" but offers no testimony but her own to substantiate such an assessment. Gage admits she has no personal knowledge of Hoffman's performance.

16

*Douglas* indirect method. *See Steinhauer v. DeGolier*, 359 F.3d 481, 484-85 (7th Cir. 2004) (determining that plaintiff failed to establish a prima facie case under the indirect method because employees were not similarly situated -- plaintiff was still on probation while another employee who engaged in the same misconduct was not). Given *Steinhauer*, Gage would not be able to establish a prima facie case under the indirect method because she would not be able to point to a similarly situated probationary employee who was not African-American who was treated differently. It is unclear, however, if *Steinhauer*'s holding applies to the second *Troupe* factor. Even if the standard does apply, Gage's attempt to raise an inference of discrimination under the direct method does not require her to meet all of *Troupe*'s factors. Rather, she can prove her case under one type of evidence, or a combination of the types of evidence outlined in *Troupe*. *Troupe*, 20 F.3d at 736. As such, while her status as a probationary employee dooms her claim under the indirect method, she still may attempt to prove her case under the direct method by showing that the cumulative effect of all of the evidence presented raises an inference of discrimination.

The third category of circumstantial evidence outlined in *Troupe* is evidence that the employee was terminated and the reason supplied by the employer for the termination is a pretext for discrimination. "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). Gage, who consistently received commendations for her work both before and after leaving Bland's employ, received an overall rating of "Requires Improvement" on her three-month, six-month, and nine-month evaluations, and received an overall rating of "Not Satisfactory" for her one-year evaluation completed by Bland. Gage compiled responses to each evaluation detailing her view that Bland's criticisms were inaccurate and copied Bland's supervisors on her memoranda. According to the District, Bland recommended Gage's probation be terminated because she failed to follow his

instructions, she made errors on contract change orders, and she was unable to complete her assignments in a timely manner. In response, Gage first points out that Bland testified in his deposition that he had no greater problems with Gage than with the other MAIIIs, Sizemore (the previous employee in her position) or Hoffman (her replacement). With regard to Bland's specific criticisms, Gage appears to be arguing that Bland was creating a record so that he could ensure that she would not pass the probationary period. He did this, according to Gage, because of Bland's bias against African-Americans. Regarding the complaint that Gage made errors on change orders, she explains that Bland's criticism related to a one-cent discrepancy in the change order for Big O' Movers which Bland contends took Gage four months to correct. However, Gage testified that this variance was approved by both Bland and Sizemore. Moreover, Gage did contact the field representative, but was told the contract was complete. Further, Gage reported that she was blamed for mistakes made by others in the field. According to Jackie Lee, an African-American administrative assistant who worked with Sizemore, Gage and Hoffman, "no matter what was done [by Gage], no matter what amount of work was done, how correct it was or what deadlines were met," Bland was dissatisfied. (Pl. LR 56.1 ¶ 424).

The District states that Gage also was terminated because she failed to follow Bland's instructions. Gage received two warnings for "failure to follow supervisor's instructions". Bland reprimanded Gage for not being present at her desk at one point when Bland was looking for her. Gage provided a copy of an email she sent Bland informing him that she was in a meeting with an employee from the Purchasing Department during the period when he was looking for her. The other warning was for remaining in the building after 4:45 p.m. to compose a response to her nine-month performance evaluation. Gage submits that these two warnings were issued so that Bland would have a reason to rate her down on her next evaluation.

Finally, the District posits that Gage was terminated because she failed to complete assignments in a timely manner. In response, Gage argues that Bland created a situation in which she would be unable to timely complete her tasks. She cites as support the testimony of CPU staff who reported that Bland ordered them to refrain from assisting Gage in completing her tasks and to the fact that Bland transferred Sizemore out of the CPU unit leaving Gage without her assistance. She also contends that Bland withheld necessary training so that Gage would not be able to complete her projects in a timely manner. Similarly, Gage points to Equal Employment Officer Wilkins' conclusion that Bland's rating of Gage's "volume of acceptable work" should have reflected the actual time Gage worked in CPU and not the full three-month rating period.

In evaluating pretext, we are not to sit as "super personnel departments to second guess an employer's facially legitimate business decisions." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002). At the same time, we must evaluate whether the District's reason for terminating Gage's probation had no basis in fact, did not actually motivate the discharge, or was insufficient to motivate the discharge. *Davis v. Con-Way Transp. Central Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004). "Pretext means deceit used to cover one's tracks." *Id.* At this point, we must view the evidence in the light most favorable to Gage. Given the testimony presented by Gage that Bland kept a detailed log of her activities; rated her volume of work based not on the actual time she had worked, but on a fixed three-month time period; and denied her access to training and a complete support staff, we conclude that a factfinding jury could reasonably determine that the District's proffered reasons for terminating Gage's probation were pretext for racial discrimination.

At this stage, because we must draw reasonable inferences in Gage's favor, we find that a combination of all the circumstantial evidence Gage has presented suffices to raise a genuine issue of material fact as to the possibility that Bland terminated Gage because of her race. For this reason, the

19

District's motion for summary judgment on Gage's Title VII claim of discriminatory termination is denied.

## 2. **Hostile Work Environment**

An employer violates Title VII when it engages in racial harassment that creates a hostile or offensive working environment. *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 673 (7th Cir. 1993). To demonstrate a statutory violation, a plaintiff must prove that her work environment was subjectively and objectively offensive, the harassment was based on her membership in a protected class, that the conduct was severe or pervasive, and that there is a basis for employer liability. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). However, conduct that is "not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court must consider the "totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Cerros,* 288 F.3d at 1046 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

In this case, the parties agree that on Gage's first day of work, Bland made the beautiful black woman statement. Gage also acknowledges this statement was the only time Bland specifically referred to Gage's race. One racially-related comment, while inappropriate for the workplace, falls short of creating an abusive work environment. The other offensive comments, which, at a minimum, demonstrate ignorance, were all allegedly made to other employees, not to Gage. Gage does not posit she even overheard such comments. When statements are made to other employees, "the impact of [such] second-hand harassment is obviously not as great as the impact of harassment directed at the

plaintiff." *Russell v. Bd. of Trustees of the Univ. of Illinois*, 243 F.3d 336, 343 (7th Cir. 2001) (citation and quotation marks omitted).

Gage also considers Bland's conduct to be hostile. According to Gage, the following evidence supports her claim: Bland berated and yelled at Gage, including telling her to "cut the bullshit line"; Bland accused Gage of being less than truthful on one occasion; Bland told Gage he would rather pay a bum $10 to see a movie than to have Gage attend training she requested; when Gage asked to reschedule training because of a doctor's appointment, Bland e-mailed Gage telling her he did not believe a nurse put a weapon to Gage's head to schedule an appointment; Bland kept a daily log of Gage's activities; Bland required Gage to inform him when she left her work station; and he made Gage revise assignments for stylistic reasons. Additionally, Gage points to the testimony of Neil Brill, a white co-worker, who stated that Bland verbally abused Gage, Elayne Jackson and Florence Santos, all minority employees, whereas Bland treated Caucasian female employees, Sizemore, Dunlap and Collins, better. This is the entirety of the evidence to which Gage points in support of her claim.

The Seventh Circuit has made clear, however, that the discrimination laws "do not mandate admirable behavior from employers." *Russell v. Bd. of Trustees of the Univ. of Illinois*, 243 F.3d 336, 343 (7th Cir. 2001). Assuming all of the above actions occurred as Gage submits, we still do not find that the environment described by Gage was racially hostile under Seventh Circuit law. It is clear from Gage's complaint in this case and the complaints she made to her supervisors that she considered Bland's comment and conduct to be so severe and pervasive as to make her work environment hostile. However, *Cerros* explains that we must also evaluate the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046, 1048 (7th Cir. 2002). The one racial comment Bland made to Gage is an isolated offensive comment. Bland's

21

conduct, which, according to Gage, was frequent, was not physically threatening or humiliating. Furthermore, requiring Gage to revise her work, even for stylistic reasons, monitoring whether she is present at her workstation, and telling her to cut the bull, while perhaps not demonstrating admirable supervisory skills, is not abnormal workplace conduct and not a basis for a Title VII claim. Taken altogether, we do not think Bland's behavior could be considered so severe as to effect an employee's job performance. *Compare, e.g., Cerros*, 288 F.3d at 1040 (finding that plaintiff had shown enough to go to trial on a racial harassment claim where employees and supervisors referred to plaintiff as brown boy, spic, wetback, Julio and Javier; racial epithets were painted on bathroom walls referring to Hispanics and plaintiff and touting the KKK; and plaintiff's tires were slashed) *with Williams v. Metropolitan Water Reclamation Dist. of Greater Chicago*, No. 01-0514, 2002 WL 484860, at * 5 (N.D. Ill. Mar. 28, 2002) (finding that isolated race-based discriminatory comment: "When I was Plant Manager out here before, it wasn't the Italians that I had a problem with, it was you blacks" was not actionable as hostile work environment under Title VII because it was neither threatening nor severe and other evidence only indicated that supervisor was harsh, difficult and unfair, but did not necessarily indicate he harbored race-based animus). Further, Gage admits that Bland's conduct did not interfere with her ability to do her job. In sum, we find that Gage has failed to demonstrate a genuine issue of material fact regarding a hostile work environment. Accordingly, we grant the District's motion for summary judgment on Gage's hostile work environment claim.

### 3. **Retaliatory Action**[10]

Gage also claims that she was demoted because she engaged in protected conduct. Title VII

---

[10] Gage's complaint also raises a claim based on her transfer to a different department in January, 2003. In her memorandum opposing summary judgment, however, Gage states that she is not pursuing a claim for her involuntary transfer. (Mem. Opp. at 1 n.1). We therefore dismiss this claim.

prohibits an employer from discriminating against an employee because the employee opposed a practice

deemed unlawful under the Act. 42 U.S.C. § 2000e-3(a). An employee may establish a prima facie case

of retaliation using the direct or indirect method. Under the direct method, Gage must present direct

evidence of "(1) a statutorily protected activity; (2) an adverse action taken by the employer and (3) a

causal connection between the two." *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 508 (7th Cir.

2004). Alternatively, under the indirect method, Gage must show that only she "and not any similarly

situated employee who did not file a charge, was subjected to an adverse employment action even

though [s]he was performing h[er] job in a satisfactory manner." *Stone v. City of Indianapolis Pub.

Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see also Rhodes*, 359 F.3d at 508.

Gage does not present this Court with any direct evidence which establishes that the District

terminated her probation in November 2001 as a result of any informal complaints she made accusing

Bland of racial discrimination.[11] Instead, Gage presents her case under the indirect method. Using the

factors set forth in *Stone*, Gage asserts she engaged in protected activity when she complained to Bland

about his comment on her second day of work; when she complained to Wilkins on February 22 and 25,

2001; when she complained to the Commissioners; when she complained in May 2001 to O'Connor;

and when she composed a letter addressed to the Director of Personnel and others on August 31, 2001

accusing Bland of racially discriminatory conduct. She argues that other employees who did not

---

[11] In arguing that she has submitted direct evidence, Gage refers to the proximity of her
August 31, 2001 complaint and her November 2001 termination and she states she has proferred
"other evidence." Although she alludes to other evidence, she points to none which would support
her retaliation claim. Such a conclusory statement is not sufficient to establish a prima facie case of
retaliation. *See, e.g., Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531-32 (7th Cir. 2003)
(determining that retaliation claim failed under direct method because plaintiff did not bring forth
any evidence that her termination was related to her internal complaint of race discrimination filed
almost a year later). Indeed, our own review of the parties' Local Rule 56.1 submissions reveals that
Gage has proffered no evidence which would demonstrate a causal connection between her demotion
and Gage's informal complaint.

23

complain were not demoted, Gage was demoted, and she was performing her job in a satisfactory manner.

The District concedes that Gage engaged in a statutorily protected activity when she complained to her superiors on August 31, 2001, and concedes that she suffered an adverse employment action in the form of a demotion. The District does not admit Gage was performing her job satisfactorily or that Gage can point to a similarly situated employee.[12]

As an initial matter, Gage has not pointed to any similarly situated employee. She provides only a conclusory statement that "no employees under Bland who did not complain of discrimination by him were demoted." Failure to point to a similarly situated employee alone dooms her attempt to establish a prima facie case of retaliation under the indirect method. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) ("failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim."). Even if we were to assume Gage could make out a prima facie case of retaliation, ultimately, she would be unable to show the existence of a genuine issue of material fact regarding pretext.

The District explains that Gage was terminated because she failed to follow Bland's instructions, she made errors on contract change orders, and she was unable to complete her assignments in a timely

---

[12] To the extent Gage relies on the complaints she made on day two to Bland, and to Wilkins and others in early 2001, the District argues that those complaints are too attenuated to show a nexus between the complaints and her eventual termination. The District confuses the direct and indirect methods' standards. If Gage can meet the elements under the indirect method, she "need not show even an attenuated causal link." *Rhodes*, 359 F.3d at 508 (quoting *Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003)). However, Gage has pointed to no case which would support her position that these complaints are protected acts. Indeed, recent Seventh Circuit case law suggests otherwise. *See Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (holding that an employee's informal complaints did not constitute protected activity until she complained through the formal channels of the employer's complaint mechanism). As for her informal complaints to Frances Wilkins in February 2001, we note that prior to that complaint, Bland had already negatively evaluated Gage's performance. His negative evaluations continued for the rest of the year.

manner. Gage presents no argument whatsoever in her response to the District's summary judgment motion regarding pretext, and presents no facts which would warrant an inference that she was terminated because she complained of discrimination. According to Gage, from her first day of work, Bland treated her differently because of her race and began creating a paper trail of her failings so that she would be terminated. Her very first evaluation by Bland, she alleges, was tainted with his racial bias. This negative evaluation and two others preceded her informal complaint of discrimination. Moreover, Gage does not allege that Bland's behavior escalated or that any of the discriminatory acts of which she complains occurred shortly after complaining of Bland's conduct. Although there certainly could be two reasons for Bland's actions, Gage has pointed to no evidence which would raise an inference that she was retaliated against for any of her complaints of discrimination and fails to direct us to any evidence which would indicate that the District's justification for her termination was pretext for retaliation. As such, her retaliation claim fails.

**B.      Section 1983**

Gage also claims that the District should be liable for the deprivation of her constitutional rights. Government entities cannot be held liable under § 1983 unless an official policy or custom caused the deprivation of constitutional rights. *Kujawski v. Bd. of Comm'rs. of Bartholomew County, Indiana*, 183 F.3d 734, 737 (7th Cir. 1999). An unconstitutional policy or custom can be: 1) an express policy that causes a constitutional deprivation; 2) a widespread practice that is so well-settled that it constitutes a "custom" with the force of law even though it is not authorized by an express policy or written law; or 3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Palmer v. Marion County*, 327 F.3d 588, 594-95 (7th Cir. 2003). There must be an "affirmative link" between the policy and the alleged constitutional violation. Gage does not identify a specific written policy that caused the termination of her probation. Moreover, the parties agree that the District's Board

of Commissioners establishes the policies of the District. Gage admits that she has not alleged that the Board engaged in any conduct in violation of § 1983 nor does she suggest her injury was caused by any individual with final policymaking authority. Rather, Gage alleges the District's conduct towards her is part of a widespread pattern and practice of depriving African-American[13] employees of their constitutional rights. Gage argues that she has come forward with many instances of overtly racial conduct and discriminatory treatment, yet the District has failed to remedy the pervasive misconduct. She also contends that the highest level of management condoned or ignored racial harassment. Finally, she asserts that the District maintained an inadequate system of addressing discrimination complaints.

The District argues that no genuine issue of material fact exists because Gage has set forth no facts which would indicate the existence of a widespread practice of depriving African-Americans of their constitutional rights. Because she has the burden of proving the District's unconstitutional custom, to defeat summary judgment, Gage must set forth specific facts showing that there is a genuine issue of fact remaining to warrant a trial regarding the alleged custom. *Palmer*, 327 F.3d at 595. In support of her allegations that a custom of racial discrimination exists at the District, Gage points to a chart she compiled analyzing the promotion rates of African-Americans as compared to white employees. While the District admits it has not performed an analysis of the progression rates of African-Americans as compared to non-minority employees, it responds that Gage's analysis does not take into consideration several relevant variables. For instance, many of the positions at the District require an employee first to pass a competitive examination. Additionally, only those employees who place in the highest category of test-takers may be selected for the position. Without taking into account these and other nondiscriminatory explanations for the promotion rates, Gage's calculations are not particularly

---

[13] Although Gage identifies African-Americans as those whose rights are deprived by the alleged custom, the evidence she proffers to support her claims involve members of other minority groups as well.

probative of discrimination. Indeed, statistical evidence "that fails to properly take into account nondiscriminatory explanations does not permit an inference of discrimination." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616-17 (7th Cir. 2000) (citation and internal quotation marks omitted). Moreover, Gage's analysis accounts for only fifty-eight current or former Management Analysts. Thus, it does not account for the majority of the District's workforce: overall, the District has 269 classifications containing 2161 positions. In short, Gage's analysis does not present a complete picture of the promotion rates at the District and is not reliable enough to permit a reasonable jury to conclude that a custom exists.

The same failings plague Gage's reliance on conclusions made by Patricia Harmon, an African-American District employee, who claims she was repeatedly passed over for promotions which were awarded to white women. Harmon, who is the Principal Office Support Specialist, stated in a declaration proffered by Gage, that she interviewed fifteen African-American District employees and reviewed various seniority reports. Based on this information, Harmon concluded that African-Americans were promoted through clerical positions at slower rates than whites. (Harmon Decl. ¶ 22). Even if the statistics Harmon presents are accurate, which the District denies through the affidavit of its Supervising Personnel Analyst, her analysis fails to account for possible nondiscriminatory explanations for the promotion rates. Further, Harmon only analyzes data from fifteen employees. Neither Harmon nor Gage have provided any support for a conclusion that their analyses are representative or illustrative of the District as a whole or are sufficient to establish a widespread practice of discrimination in the District.[14] While we question the validity and probative value of Harmon's study, it is interesting that

---

[14] Gage also points to an independent investigation conducted by Callie Baird, as support for her claim of widespread discrimination against African-Americans. The "Metropolitan Water Reclamation District: Sexual Harassment Investigative Report" ("Baird Report") however, investigated reports of sexual harassment within the District and evaluated the District's handling of complaints of sexual harassment. Gage has not established how the report supports her claim of

she testified in her deposition that, having reviewed the performance ratings for over 200 employees, she found that Gage's probationary rating was highly unusual. She observed that Gage was the only probationary employee that she could identify that did not receive at least a "Meets Standards" rating on her three-month performance evaluation. This testimony undermines Gage's argument that she was terminated as part of a widespread custom to discriminate against African-Americans.

Gage also claims that the District condoned incidents of racial discrimination and failed to take remedial action. But Gage has pointed to incidents that only occurred in the units supervised by Bland, not to the District as a whole. To the extent Gage is attempting to argue that the District condoned Bland's hostile conduct towards his employees, Gage has not demonstrated that Bland's hostility was directed only towards African-Americans or was otherwise race-based. For instance, Gary Ziols, Bland's supervisor, testified that there were conflicts between Bland and Dunlap, who is white. Likewise, Neil Brill, also white, testified that Bland treated him poorly. Furthermore, Gage has not provided any evidence that the Board condoned the termination of African-American probationary employees or African-American civil status employees because of their race. In fact, she has pointed to no other African-American employee who was terminated or demoted by Bland or the District. The only employee terminated while on probationary status under Bland to which Gage points is Ramam Vaitla, an East Indian Computer Systems Administrator, whose probation was terminated by Bland in 1994 with a rating of "Unsatisfactory." However, the fact that one supervisor terminated the probation of two minority employees does not a custom make. Municipal liability requires more than the mere fact that a low-level supervisor took some action that was not later reversed by a policymaker. *See Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002). Otherwise, we would be allowing

---

systemic racial discrimination. Indeed, the report does not make any conclusions about race, although it does recommend a similar investigation be conducted on the issue of race discrimination. *See* Pl. Ex. 64.

municipal liability claims to proceed on the basis of *respondeat superior*, which is specifically precluded in § 1983 actions by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691 (1978). Therefore, Bland's conduct alone cannot serve as the basis for municipal liability.

A practice of unconstitutional conduct may provide a basis for municipal liability, even if it lacks formal approval, if a plaintiff can establish that the policymaking authority knew of and acquiesced in a pattern of unconstitutional conduct. *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995) ("The usual way in which an unconstitutional policy is inferred ... is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned ... the misconduct of subordinate officers."); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice."). Gage has not presented evidence of a pattern nor has she demonstrated that the Board knew of or acquiesced in a pattern of terminating or otherwise discriminating against employees on the basis of race.[15]

_____

[15] Gage appears to be suggesting that the Board also knew of and acquiesced in Bland's mistreatment of African-American employees. While we have already determined that Bland's hostile conduct has not been proven to be race-based, we also find that Gage has not demonstrated that the Board had any knowledge about any of the incidents recanted in the testimony Gage proffered. While Gage did notify numerous supervisors of her own problems with Bland, her experience alone is not sufficient to constitute a widespread practice of discriminatory conduct at the District, nor would it otherwise place the Board on notice that a pattern existed. Stewart did complain informally to Wilkins in 1998, but Stewart testified "There's a couple of times [Bland] pissed me off and off the record at lunch, you know, I'd vent." (Stewart Depo. at 112). There is no evidence that the Board was aware of such informal conversations. Similarly, although Gage also points to the fact that Stewart testified that she complained of Bland's rating of Stewart's performance in 2002, that is not relevant to whether Gage was terminated as a result of a custom that purportedly existed in 2001. *See, e.g., Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994) (explaining that subsequent conduct usually is irrelevant to determining a municipality's liability because a custom is predicated on the theory that it "knew or should have known about the unconstitutional conduct on the day of the incident").

Gage also contends that the District ignored complaints of racial discrimination and harassment. To demonstrate liability, Gage must show that the District customarily or habitually ignored complaints of racial discrimination or harassment. *See Garrison v. Burke*, 165 F.3d 565, 572 (7th Cir. 1999). Gage acknowledges that, at the time of the termination of her probation, the District had in place two directives covering complaints of discrimination: 98-6 ("Receipt and Processing of Informal Complaints of Discrimination") and 00-1 ("Receipt and Processing of Informal Complaints of Harassment"). GS Directive 98-6 "provides for the counseling by the EEO/Training Manager of any aggrieved employee who believes he or she has been discriminated against because of their race . . . and provides for the resolution of the issue(s) raised on an informal basis." GS Directive 00-1 "details the rights and responsibilities of individuals who believe they have been harassed by a supervisor based on their race . . . It also provides for counseling, investigation and informal resolution of complaints of harassment." If an employee wishes to lodge a complaint under either Directive, he or she must fill out a "Discrimination and Harassment Complaint Filing Form."

According to Equal Employment Officer Wilkins, if an employee raises an issue of discrimination, she counsels them, provides them with a complaint form, and will conduct an investigation only if the forms are completed. Wilkins testified that she does not document complaints of discrimination before the employee fills out the complaint form, nor does she take any action if no form is filled out by the employee. The District states that unless an employee fills out a discrimination form, the employee's concerns are not considered a formal complaint. If an employee files a complaint but does not fill out the form, the employee must specifically request an investigation.

Gage has come forth with no evidence that an employee who lodged a complaint by filling out the District's complaint form did not have his or her claim investigated by Wilkins, the Equal Employment Officer. Gage has provided no testimony or evidence that an employee who completed a

complaint form even subjectively felt ignored. Further, Gage has presented no evidence that an employee who did not fill out a form but specifically requested an investigation did not receive an investigation of his or her complaint. In fact, even before Gage completed a complaint form, O'Connor, following a meeting with Gage wherein she informed him of Bland's beautiful black woman comment, instructed Wilkins to investigate Bland's three and six-month evaluations of Gage's performance.

Nevertheless, Gage argues that the District had a "subversive system of addressing complaints." From this solitary statement provided in her response to the motion for summary judgment, we can glean only that Gage posits that the complaint process, in practice, was a sham. Gage, however, does not proffer any evidence that Wilkins or the District conducted an inadequate or improper investigation following the receipt of a complaint form. Instead, Gage takes issue with how Wilkins handled Gage's own informal complaints. For example, Gage states that she wrote a letter to Wilkins in February, 2001, asking her to inform her of her options in dealing with Bland's behavior. In the letter, she informed Wilkins of the beautiful black woman statement and that she found it inappropriate. According to Gage, Wilkins told her she did not really have any options because she was on probation. Wilkins denies having made this statement. Wilkins' investigative report of Bland's three and six-month evaluations did not document Gage's allegation of discriminatory treatment nor did it address discrimination. Rather, it addressed whether Bland's negative evaluation was supported. Because Gage never filed a formal complaint of discrimination on one of the forms, Wilkins testified that she had no obligation to conduct an investigation. She also did not share Gage's letters of February 2001 with anyone because she did not consider them complaints. Wilkins testified she was not aware Gage was complaining of discrimination until Gage's August 31 memo. That August 31 memo was Gage's response to Bland's nine-month evaluation. In it, Gage stated that Bland was discriminating against her based on her race. Gage accuses Wilkins of being evasive about the documentation she needed to provide to lodge a

31

complaint against Bland. However, following Gage's written accusation in her August 31, 2001 memo, Wilkins did send Gage a letter informing her of the two District directives and attaching the District complaint form. She also outlined the procedures for filing an informal complaint of discrimination. (Def. Ex. 60). Gage's experience, while not ideal, is not enough to demonstrate a widespread practice.

However, Gage posits that Wilkins was also evasive with regards to other African-American employees who wished to lodge complaints. In addition to her own experience, Gage submits the testimony of Pat Harmon, who stated that she was discouraged by Wilkins from filing a complaint against Bland for requiring her to work out of classification. (Harmon Dep. at 41).[16] Wilkins also testified that Elaine Santos, who is Filipino, raised concerns about the conditions of her employment under Bland but never filed a complaint with her regarding Bland. Wilkins testified Santos did not use the word discrimination when referring to Bland's conduct so she did not commence an investigation. Neither Santos nor Harmon were terminated or demoted. Based on this information, there is no way of assessing the merits of these allegations because the employees were unwilling to reduce their complaints to writing or request that an investigation be conducted into the incidents. Certainly, the Board cannot be said to have acquiesced or ignored these complaints if the mechanisms in place to notify it were not utilized by aggrieved employees. Indeed, Gage does not even attempt to make such an assertion. Gage has provided no evidence that the Board knew of these incidents or of Wilkins' handling of these two informal complaints. Without more, there is insufficient evidence to find that the District was on notice of, or acquiesced in, a custom of ignoring complaints based on these two incidents.

Gage suggests that an employee should not have to complete a form in order to file a complaint of discrimination. She believes her informal complaints to Wilkins orally and in writing in early 2001

---

[16] Gage points to the testimony of others who informally complained to Wilkins about various matters, but those complaints did not relate to race discrimination or other forms of discrimination prohibited by law.

should have prompted an investigation. If such a mechanism had been in place, she believes the District could have tracked employees' complaints of Bland's conduct and been on notice of Bland's pattern of behavior. For instance, she points to the testimony of the Director of Personnel who acknowledged he was not aware of any list or mechanism for tracking discrimination complaints that were not on the District's complaint forms.[17] However, Gage offers no evidence or argument that this procedure governing informal complaints caused a constitutional injury.

Finally, Gage contends that the upper management did not adequately address her complaints. According to Gage, once she concluded Wilkins was not assisting her, Gage states that she complained about Bland to his superiors. Although O'Connor asked Wilkins to conduct an investigation into Gage's performance evaluations, he did not specifically request an investigation into race discrimination. Gage explains that she resorted to writing letters to Commissioners Harris and McGowan in September and October 2001 because she had spoken with Wilkins and her superiors and she did not feel that anyone was responding adequately to her complaints. While perhaps not indicative of the most responsive superiors, Gage's personal experience does not indicate that the District has a widespread custom of inadequately addressing complaints of discrimination. If anything, Gage's criticisms of the informal process demonstrate only how failing to follow the proper complaint procedures, in this case the filing of a discrimination complaint form, stymies an efficient response to the problem. Given all of the above, we find Gage has not shown a pattern of constitutionally offensive acts or a failure of the Board to remedy those acts.

---

[17] Gage also argues that the District has not modified its policies with respect to how complaints about racial discrimination are handled following the Baird Sexual Harassment Investigative Report. However, the Baird Report was commissioned in 2002 and released in May 2003. At issue in this case is what custom was in place at the time of Gage's termination in November 2001 and if the Board was on notice of a widespread custom or practice in existence at that time. Accordingly, the 2003 Baird Report has little bearing on the District's knowledge before its release.

In sum, we find that Gage has pointed to no facts in the record from which a reasonable jury could find that a policy or custom of racial discrimination existed.

## IV.    CONCLUSION

For the foregoing reasons, we deny in part and grant in part Defendant's motion for summary judgment. We enter summary judgment for the District on Gage's hostile work environment, retaliation, and § 1983 claims. We deny the District's motion for summary judgment as it relates to Gage's Title VII claim of discriminatory termination of her probation. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated  8/17/04